614 So.2d 714 (1993)
Eusebio VILLA, Plaintiff-Appellant,
v.
Michael DEROUEN, et al., Defendants-Appellees.
No. 92-61.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1993.
Charles Porter, New Iberia, for plaintiff-appellant.
Michael Campbell, New Iberia, and Cameron Simmons, Jeanerette, Landry & Watkins, *715 Wm. R. Repaskey, New Iberia, for defendants-appellees.
Before YELVERTON, KNOLL and SAUNDERS, JJ.
SAUNDERS, Judge.
This is an appeal by Eusebio Villa, plaintiff and appellant herein, from a jury verdict in favor of Michael Derouen, Villa's co-employee, and Louisiana Farm Bureau Mutual Insurance Company, Derouen's homeowner insurer, defendants and appellees herein. This case involves facts wherein an intentional act, by Derouen, i.e., the act of pointing a welding cutting torch in Villa's direction and intentionally releasing oxygen or acetylene gas caused unintentional harm to Villa, i.e., second degree burns to Villa's groin area.
After trial, the jury found that the defendant, Derouen, did not commit an intentional tort against Villa and, therefore, was not liable for Villa's injuries. This finding of the jury foreclosed Villa from recovery in this action insofar as Villa is limited to worker's compensation unless it was found that Derouen committed an intentional tort which caused Villa's injuries.
Villa appeals contending that the jury erred in its finding that Derouen did not commit an intentional tort against Villa. We agree with Villa's contentions and find that the jury clearly erred in finding that Derouen's intentional act of spraying his welding torch in Villa's direction did not constitute an intentional tort, specifically, a battery against Villa. As such, we reverse the judgment of the trial court and award damages accordingly.

FACTS
This claim for damages arises out of an accident which occurred at M.A. Patout & Sons, Iberia Parish, Louisiana, on May 7, 1986. The evidence is undisputed that Eusebio Villa sustained burns to his crotch area and that these burns were caused by the actions of his co-employee, Michael Derouen.
At the time of the accident, Villa was welding with a welding torch or welding whip. Derouen was standing to his left, using a cutting torch. Intending only horseplay, although one-sided, Derouen turned toward Villa and discharged his torch. Under cross-examination, Derouen responded affirmatively when asked if he placed the torch between Villa's legs and also responded affirmatively when asked if he intended to spray Villa between the legs with oxygen when he placed the torch between Villa's legs.
On direct examination, in response to questioning by his own attorney, Derouen qualified his previous answers, as follows:
"Mr. Lambert: ... you did not have it in close proximity to his crotch?
Mr. Derouen: No.
Mr. Lambert: In fact, you did not even have it inside his body?
Mr. Derouen: No.
. . . . .
Mr. Lambert: When you squirted that, did you intend that that air actually cause him any pain, even minor pain?
Mr. Derouen: No.
Mr. Lambert: Did you intend that he even feel anything from the little bit of air?
Mr. Derouen: No.
Mr. Lambert: Why did you do it? What was your intention of doing that?
Mr. Derouen: To get his attention."
Troy Mitchell, a co-employee, testified that a few minutes before the accident, he saw Derouen take his torch and blow pressurized oxygen behind Villa's neck into Villa's lowered face shield while Villa was welding. Mitchell testified that he told Derouen not to do that because it could ignite. Mitchell additionally testified that he thought Villa had also told Derouen to stop fooling around. Only a few minutes later, the accident which resulted in Villa's burns occurred. Mitchell did not witness the accident because his welding hood was down at the time.
Marty Frederick, a co-employee of Villa's, and Lambert Buteau, their supervisor, both testified that although they did not witness the incident, and could not remember Derouen's exact words after the incident, *716 both understood that Derouen, in relating what had happened, was playing around with the cutting torch and "goosing" or trying to scare Villa at the time of the accident.
Derouen testified that he sprayed pressurized oxygen near plaintiff's face prior to the accident. Villa testified that he felt the oxygen that Derouen blew on his face or head, heard Troy Mitchell telling Derouen to stop because Villa could be hurt, and made a remark himself to Derouen about it. Villa testified that, a few minutes later as he was welding with his face covered by his welding hood, he felt something blowing between his legs. He held still for a second, so as to not interrupt his welding, until he felt the pain in his groin area. He stated that, "I just grabbed with both of my hands. When I grabbed, it was a torch." He continued by stating, "I grabbed in my private area where I feel the fire, and right there was the torch. I pushed it like that. It was Michael Derouen with the torch in his hand."[1]
The fact that Villa reached down to his groin at the time of the injury, and either grabbed the torch or pushed it away, was undisputed at trial. It was also undisputed that, at the time of the accident, Villa was crouched welding with his welding hood down. The evidence revealed that while he was welding, due to the noise caused by the welding, Villa would not have heard Derouen's torch aimed in his direction.

DISCUSSION
If an employee is injured as a result of an intentional act by a co-employee, LSA-R.S. 23:1032(B) allows him to pursue a tort remedy against that co-employee. In Bazley v. Tortorich, 397 So.2d 475 (La.1981), the Louisiana Supreme Court determined that "an intentional tort", for the purpose of allowing an employee to go beyond the exclusive remedy of worker's compensation, meant "the same as `intentional tort' in reference to civil liability."
A civil battery has been defined by the Louisiana Supreme Court in Caudle v. Betts, 512 So.2d 389, 391 (La.1987) as, "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact...." (Citations omitted.)
The Louisiana Supreme Court in Caudle, supra, at page 391, continued by stating:
"The intention need not be malicious nor need it be an intention to inflict actual damage. It is sufficient if the actor intends to inflict either a harmful or offensive contact without the other's consent. (Citations omitted.)
....
"The element of personal indignity involved always has been given considerable weight. Consequently, the defendant is liable not only for contacts that do actual physical harm, but also for those relatively trivial ones which are merely offensive and insulting. (Citations omitted.)
"The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Restatement (Second) of Torts, American Law Institute § 13 (comment e) (1965). Rather it is an intent to bring about a result which will invade the interests of another in a way that the law forbids. The defendant may be liable although intending nothing more than a good-natured practical joke, or honestly believing that the act would not injure the plaintiff, or even though seeking the plaintiff's own good." (Citations omitted.)
Pursuant to this jurisprudence, we must determine whether Derouen committed a battery against Villa. Did Villa suffer an offensive contact which resulted from an act by Derouen which was intended to cause that offensive contact? Or as stated by Bazley, supra, at page 481, did Derouen entertain "a desire to bring about the consequences that followed", or did Derouen believe "that the result was substantially *717 certain to follow", thereby characterizing his act of spraying Villa as intentional?
There is a distinction between an intentional act which causes an intentional injury and an intentional act which causes an unintentional injury. To constitute a battery, Derouen need only intend that the oxygen he sprayed toward the plaintiff come into contact with Villa, or have the knowledge that this contact was substantially certain to occur.
The physical results or consequences which must be desired or known to a substantial certainty in order to rise to the level of an intentional tort, refer to the requirements of the particular intentional tort alleged. In this case, wherein Villa has alleged a battery, the harmful or offensive contact and not the resulting injury is the physical result which must be intended.
The record reveals that, although correctly instructed by the trial court, the jury appears to have been confused on this issue and, as such, manifestly erred, as a matter of law, in their verdict. The court instructed the jury as follows, as to the definition of the intentional tort of battery:
"In order for Eusebio Villa to recover from anyone in this case, he must first prove, by a preponderance of the evidence, that he was injured as a result of an intentional act. The meaning of intent in this context is that defendant either desired to bring about the physical results of his act, or believed that they were substantially certain to follow from what he did.
"Eusebio Villa has alleged that Michael Derouen committed a battery upon him. A harmful or offensive contact with a person resulting from an act intending to cause the plaintiff to suffer such a contact is a battery. A battery in Louisiana law is an intentional act or tort.
"The intention to commit the battery need not be malicious nor need it be an intention to inflict actual damage. The fact that it was done as a practical joke and did not intend to inflict actual damage does not render the actor immune. It is sufficient if the actor intends to inflict either a harmful or offensive contact without the other's consent. It is an intent to bring about a result which will invade the interests of another in a way that the law forbids.

. . . . ."
Although this definition was technically correct, several defense counsels, both in opening and closing statements, told the jury that, in order for them to find Derouen liable, they must find that Derouen intended to hurt Villa and/or intended to burn Villa. Additionally, the jury was misled by statements that their verdict in favor of Villa would make Derouen a criminal insofar as a battery was a crime.
The jury voiced its confusion by sending a question to the judge asking him what the difference was between "an intentional tort and intentional (on purpose)." After the judge again instructed the jury with the charge set forth above, the jury sent out the query below to which the trial judge answered, as written:
*718 
Clearly the jury was confused as to whether they were to determine Derouen's intent to perform the act or his intent to cause the resulting injuries. No clarifying instruction was given to the jury on this point of law. Had they understood the law, a reasonable juror could not have found that Derouen did not intend the act of directing compressed oxygen in the direction of Villa's groin.
This distinction between an intentional act or unintentional act was recently highlighted in Lyons v. Airdyne Lafayette, Inc., 563 So.2d 260 (La.1990). In Lyons, an employee sued a co-employee alleging injuries as a result of the co-employee shooting a stream of compressed air at the plaintiff. The trial court granted summary judgment which was affirmed by this court. The Louisiana Supreme Court granted a writ of certiorari, and reversed the grant of summary judgment in favor of the defendant, stating as follows:
"There is a genuine issue of material fact whether plaintiff's co-employee intentionally shot the stream of compressed air at plaintiff and injured him or whether the co-employee accidentally released the stream while repairing the compressor."
Id. at page 260.
Conversely, in the case at bar, there is no question as to whether or not Derouen intentionally shot the stream of compressed air at Villa.
This is not a case of an accidental release of pressurized oxygen or gas in Villa's direction. Derouen testified that he did not intend, even the air he was pointing in Villa's direction, to come into contact with Villa. It was unreasonable for the jury to accept that Derouen blew his torch at Villa, while Villa was welding and surrounded by the accompanying noise, in order to get Villa's attention, but did not intend for Villa to feel the air directed at him.
In this case, Derouen intended to release the pressurized oxygen in Villa's direction, at a minimum, to get Villa's attention. Due to the noise, he would not have been able to get Villa's attention unless Villa felt the air.
The facts are undisputed that Derouen aimed his welding torch and sprayed the pressurized oxygen or gas, which ignited, at Villa's groin or at the ground between Villa's legs. It is also undisputed that Villa was injured by the contact with the "flash" of Derouen's welding torch.
*719 We find that the jury clearly erred in finding that a battery, i.e., an unconsented to offensive contact, had not occurred. The act or battery which Derouen intended was that of blasting pressurized oxygen or gas between Villa's legs, into his groin area. Derouen testified that he merely wanted to get Villa's attention. Due to the undisputed evidence that Villa was welding at the time of the injury, which welding was by its nature, accompanied by the noise of the welding, the defendant would not have approached Villa, expecting or intending him to "hear" the blast of air and thus, get his attention, without also expecting or intending Villa to "feel" the blast of pressurized oxygen and thus, get his attention.
Under the undisputed facts presented to the jury, we find that a reasonable juror could not have found that Derouen did not either intend for the air from his cutting torch to come into contact with Villa's groin or, alternatively, we find that a reasonable juror could not have found that Derouen, in pointing his torch at Villa and releasing pressurized oxygen in the area of Villa's groin, was not aware or substantially certain that the oxygen would come into contact with Villa's groin area.

DAMAGES
Villa sustained second degree burns to his penis, scrotum, and both thighs. He was first seen by Dr. James Falterman, Sr. on May 8, 1986, who hospitalized him from May 8, 1986, through May 16, 1986. Dr. Falterman testified that Villa was reasonably comfortable, with pain medication and treatment, within three (3) to four (4) days and, at a maximum, within one (1) week after the accident. Villa's physical wounds healed completely, with some depigmentation, but no functional disability. He was discharged from treatment of his burns as of June 20, 1986.
Villa complained of being nervous and depressed on May 15, of 1986, and requested to see a psychiatrist. Villa was referred by Dr. Falterman to Dr. Warren Lowe, a clinical psychologist, who first saw Villa on June 9, 1986. Dr. Lowe diagnosed Villa as suffering from atypical anxiety disorder with depressive features together with some symptoms of post-traumatic stress disorder. At the time of trial, Dr. Lowe felt that Villa was getting better and was capable of entering a rehabilitation program.
Dr. Lowe's partner, Dr. Jim Blackburn, was offered as an expert in psychiatry. He saw Villa in August of 1986 and again, saw Villa and his wife on January 26, 1988. He diagnosed Villa as suffering from a major depression with some elements of post-traumatic stress. He felt that Villa was a very good candidate for rehabilitation and believed that Villa would make a good recovery and be able to resume a normal functional life. At the time of trial, in April of 1990, Villa had not, as yet, returned to work and remained nervous about returning to work.
Total medicals paid by Liberty Mutual, the worker's compensation insurer of M.A. Patout and Sons, Inc., Villa's employer, up to the time of trial were $14,300.00.
Glenn Hebert, a vocational rehabilitation specialist, testified that Villa was ready for and would need several years of rehabilitation counseling and/or retraining to build up his self-esteem and self-respect, and to recover from his loss of trust in people. He testified that a vocational school would cost approximately $2,000.00 for two (2) years, while concurrent counseling would cost about $900.00 per month, which would total $21,600.00 for twenty-four (24) months of counseling. This would total $23,600.00 for rehabilitation. Hebert also testified that Villa needs to go to work but would recommend conditions where he can work part-time, alone or with one other person.
Dr. Cornwell, an expert economist, testified that Villa has suffered a $57,907.00 loss of earnings from the date of the accident until trial. This figure is based upon an annual pre-accident wage of $14,772.00 per year. If Villa works, as recommended by Hebert, for twenty-five (25) hours per week at $4.25 per hour, assuming a two (2) *720 year rehabilitation period, he would have an additional loss of $18,500.00.[2]
At the time of the accident, Villa was earning $5.75 per hour and should be able to earn that or more with the benefit of two (2) years of rehabilitation. Thus, Villa's total special damages would be:

Medicals.......................$ 14,300.00
Loss of wages:
 Pre-trial ...................$ 57,907.00
 Post-trial...................$ 18,500.00
Total Rehabilitation...........$ 23,600.00
 ___________
TOTAL SPECIAL DAMAGES........$114,307.00

We find that a reasonable general damage award for Villa's past and future physical and mental pain and suffering would be $60,000.00.

CONCLUSION
The jury's verdict finding that Michael Derouen did not commit an intentional tort is hereby reversed.
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Eusebio Villa and against Michael Derouen and Louisiana Farm Bureau Mutual Insurance Company, Derouen's homeowner insurer, in the amount of ONE HUNDRED FOURTEEN THOUSAND THREE HUNDRED SEVEN AND NO/100 ($114,307.00) DOLLARS in special damages and SIXTY THOUSAND AND NO/100 ($60,000.00) DOLLARS in general damages. Judicial interest and costs at trial and on appeal to be paid by Michael Derouen and Louisiana Farm Bureau Mutual Insurance Company.

DECREE
REVERSED AND RENDERED.
NOTES
[1] Mr. Villa is a Puerto Rican native who came to the United States for the first time in 1973 and has a strong Spanish accent.
[2] $14,770.00 pre-accident annual wage offset by $5,524.00 per year earned equals an annual loss of $9,250.00 per year.